Madam Clerk, please call the last case of the afternoon. 215-08-65. All new orders will be placed for listening and writing. Good afternoon, Your Honors. Mr. Issa, Marilee Kosen on behalf of Barbara Leo. Your Honor, we realize that we were here approximately two years ago, and this case seemed familiar. And at that time, Your Honor, we made a decision that we did not have a final appealable decision from Judge Bonnie Wheaton. We're back here now. I hope procedurally correct. My argument will not have changed from what I would have done two years ago. The position that we are in today is we have two decisions from the commission. The case starts out with an arbitrary decision in favor of Ms. Leo. A commission affirms without dissent. And it went up to Bonnie Wheaton. Putting aside the first order, which she then had a recalculation by the commission, we believe that she substituted her opinion over and above the commission's original decision. When there are two decisions, our position is that what this court does, it's going to look at both decisions. The case law, Mary Glister, InterCity, all suggest that we start out by looking at the circuit court decision. If the circuit court's decision goes beyond her judicial review capabilities, we should go back to the original decision of the commission, which found Ms. Leo a point total. When Judge Wheaton looked at this case, it all seemed to come down to her view of video surveillance. But we have to review the commission's decision. Correct, both of them. Of course we do. I will not suggest that. Not Bonnie Wheaton's decision. Not at all. And what we have is on the remand decision, the remand commission did the calculation based on Judge Wheaton's viewpoint that this was just a backspring. That's what she concludes after looking at video surveillance, which we believe is not part of the appropriate manifest way standard of review when she got this case on appeal from the commission. So there are two decisions. My view is that the original decision entered by the commission should stand. It was a thoughtfully discussed decision. It highlighted two stipulated accidents. It went through the doctor review. It doesn't matter, and I think this court has said this encompassed, how many doctors are lined up on both sides. The commission reviewed the medical testimony, found that there was an aggravation of Ms. Leo's spondylolisthesis, went on to review undisputed, there was only one vocational rehabilitation person who found Ms. Leo to be a firm total. The respondent employer did not ever put in somebody to challenge that, continued simply to maintain that this was a backspring case, and the original commission did not view it that way and entered the firm total award. The employer basically indicates or argues that the surveillance video is the evidence that demonstrates she suffered nothing more than a backspring. And the commission clearly addressed that argument, stating that they considered it, the activities that were depicted de minimis and nondispositive, that they frankly gave little credence to the surveillance video as suggesting it was demonstrating only a backspring. Is that right? They did not view it as demonstrating a backspring. I think they actually, the commission acknowledged, you're talking about the original commission? The original commission. The original commission acknowledged that you see, and I actually looked at the video this morning myself again, acknowledged that you see Ms. Leo bending, but they did not view that as any type of strenuous activity, and viewed the snippets, and I reviewed them, as de minimis. And they did not then have that weight in. They acknowledged it, though. They acknowledged it, and they basically found there wasn't dispositive either way. If you don't find the surveillance to have any great dispositive weight, then all of the doctors that are lined up, Dr. Trotter, Dr. Spencer, and Dr. Mathers, their opinions are based on that video showing them something. Did the claimant become symptomatic before or after the September 2004 work accident? Okay. It is undisputed, Your Honor, that she never had any back problems. Until after the accident? Until after the accident. And I can not only, am I just saying this, not only is it in the arbitration commission decisions, but the respondent and player agreed with that, and has agreed with it in briefing, that they could not find any symptoms. Any medical records to contradict that? Correct. Nothing in the medical records. She does, there is no doubt, and I will freely acknowledge that, she does have what's diagnosed afterwards, and I hope I'm saying this correctly. I always mispronounce it. I apologize. On the lithesis, it does during the course of her treatment get quite a bit worse in terms of the millimeters of slippage, but she never had it before. So she has stipulated accidents in this case. This is what the original commission had before them, stipulated. So her credibility is not challenged. It's not a no accident case, or maybe there wasn't an accident. Employer acknowledges the accidents. She starts to treat, and there's still no issue, medical is all going forward nicely. She's treating with Dr. Mather, and then comes the surveillance, which, unless the surveillance was viewed by the commission, and the commission reversed the arbitration and says, we under no other review, we're looking at it differently. I would have a different argument in front of you right now, Your Honor, because I would be arguing against the commission. And that's a very, you know, legitimate distinguishing point. We're reviewing the commission's decision. It's an opposite conclusion, clearly apparent. They saw the surveillance tape, right? Correct. We can't substitute our judgment for them and say, well, we think the surveillance tape shows there was no injury. Okay. That's pretty hard to do on review. And, Webb, that is what we've been – and what I would suggest to you is that we all can look at the surveillance here, and all of us could each come up with a different viewpoint. I wouldn't spend the whole afternoon on that point. Well, I'm just saying, I think that's where Bonnie – Judge Levin, I'm so sorry. When she looked at it differently, didn't give the credence to the original commission, who had reviewed this matter. I don't want to belabor this much more. It is, to me, a question of, you know, the commission's decision, we believe, is very well thought out. It went through absolutely everything in this case. The only thing that I would like to point out, and we caught this late, and it is in the briefs we tried to bring it up in terms of pleadings as soon as we could, that the incorrect statutory rate was used. That would not have been an issue on the remand commission decision because they weren't talking about perm total rates. We would like Judge Wheaton's decision reversed, the matter to go back to the original commission, but with the correct statutory rate on perm total, which was incorrectly stated in the original commission decision. Supposed to use half the state weekly average for reasons that I cannot tell you how or why it happened, and that would be the only thing that really changes in the original commission decision. So I'll leave it to Mr. Eisen. Thank you. Thank you, counsel. Good afternoon, your honors, counsel. May it please the court. Britt Isley on behalf of DuPage School District 88. I'd like to go straight to the surveillance tape and Arbitrator O'Malley's viewing himself of the videotape. I think a proper analogy can be made. If, for example, I were to see a stalled car on the side of the road and I would wonder why the stalled car isn't running anymore, I wouldn't have a reason. I wouldn't have a good basis for a reason. But bring in a mechanic who can look under the hood and the mechanic can tell me that it's out of gas, the mechanic can tell me that it broke a belt or that it threw a rod, and that's why it doesn't run. It is, in my opinion, when Arbitrator O'Malley says that the footage and Barbara Leo's activities are nondispositive and de minimis, the activities were not very strenuous, that's not the point. The point, he's looking at it from a layperson's perspective. The point is what the three doctors saw when they looked at it. They saw her hyperflexing at the waist, which is without any apparent pain, which is something that Dr. Mattis, as soon as he saw it at the deposition, turned away from the tape and said, I've seen what I needed to see, because a woman with grade 2 spondylolisthesis could not possibly do that without pain, because it pinches off the spinal cord and it's just too painful. But she was seen there doing that, and that's the period of the video footage that's the most critical. So it's not that Arbitrator O'Malley wrote his decision, the commission then affirmed it, but remember, he was viewing it for himself as a layperson. We should look at it from the perspective like a mechanic looking at a car. Do you have any case law that says that?  I'm making a simple analogy. You knew that was going to be the question, didn't you? I'm sorry? You knew that was going to be the question, didn't you? Well, I was hoping a simple analogy would be a better demonstration of... Who offered the video? I offered the video. And did you ask that it be admitted for delimited purpose to serve as a basis for experts' opinions only? No. So here you're arguing something different. I mean, at the commission level you didn't suggest to the arbitrator, this isn't for you to evaluate, this is simply to serve as a basis for the expert's opinion. Is that correct? I see what you're saying. In hindsight, it benefits me by saying this, but I also think that it was critical what she did in hyperflexing, hyperextending, rather. It was critical for the doctor's viewing. In other words, the other activities of fertilizing the lawn, talking with her neighbor, going out to the market, that really didn't say much to the doctors. What said it all was her hyperextension. And three out of four doctors that saw it believed it to be so. Why Dr. Maltesos wasn't given the video, that was the... Well, I'm not sure why, but Dr. Maltesos didn't see it, and so his opinions can't be informed the way the other three can. That's why I think the remanded decision from the commission should be affirmed, because the remanded decision recognizes that Maltesos was the sole doctor that had a different opinion and also an opinion that wasn't informed as the other three were by the videotape. So I think to look at this, we can look at this as a layperson does, well, these aren't very strenuous activities, but really something that didn't strike me until Dr. Mather first saw it was that hyperextension is something that a person with a back strain can do, but a person that has symptomatic back pain from an L5S1 spondylolisthesis couldn't do without pain. And so the fact that she had this spondylolisthesis that progressively got worse over the course of her treatment is coincidental. And he said the average person couldn't do that movement without pain. Do we know if she was taking Tylenol as a medication? I don't know. Well, that could have affected your video, right? I also wish she had testified about her pain after that fertilizing event. But the point you raised wouldn't have any effect upon what the arbitrator found. The arbitrator looked at the surveillance tape and said, well, she's not exhibiting any pain. It doesn't show anything. And Spencer seems to be saying that was the problem. She wasn't exhibiting any pain when she went into hyperflexation or hyperextension, whatever he calls it. And if a person had the affliction that she's claiming that she had, they couldn't have done that without pain. And this video showed no pain. And so he said it can't be. And the only thing the arbitrator found was it showed no pain. She was able to talk to the neighbor. She was able to do this. He agreed with the doctors what the video actually showed. What he disagreed was the meaning of what it showed. And the question is, is the meaning a peculiarly medical area as opposed to what a layman can see? I don't know. I mean, Spencer, all the doctors seem to say that there's hyperflexation, hyperextension without exhibiting pain means she didn't have the affliction. Counsel, did Ms. Leo testify as to the surveillance video? In terms of knowing about it, she didn't testify. I don't remember that she testified about knowing about it or ‑‑ I didn't see anything in the record that suggested that she testified as to the events in the video or that she did not have pain during any of these activities or when she hyperextended. Would that be fair? Yes. I mean, I looked in the record as well for an expression by her that I was in pain afterwards or I wasn't in pain afterwards because I took so much medicine. What you didn't see is I took so much medicine so I wasn't in pain. She never said that either. What she had to use was a neighbor who looked on her face and her gate, actually looked at her gate and said, as a registered nurse, I can say from her gate she was in a lot of pain. Except the arbitrator found out she didn't show any pain at all. Right. While it's true that at no time is the claimant seen exhibiting signs of pain or discomfort and, in fact, appears to bend at the waist, it is also true that she is not engaging in what could reasonably be described as strenuous activity. Well, the purpose of the video was not to show that she was engaging in strenuous activity. It was to show that she was hyperextending without pain. And that's exactly what it showed. In hindsight, I'd like to say that because now I know Dr. Maddow said that. But we used it as evidence of no pain. The reason I put it into evidence was to show here's a woman who's doing her lawn work and she's not in pain. And it didn't even occur to me that the hyperextension had anything to do with it until after Dr. Maddow's testimony. It's a pretty lengthy video, and this episode of her hyperextending or flexing backwards, whatever. It's hyperextension. It encompasses, what, maybe three or four seconds of the video. If you had testimony from Ms. Leo indicating, yeah, I see what you're pointing to in the video, and no, that didn't cause me any pain, maybe, you know, you would have a stronger argument here because then you would have the medical experts saying absolutely not. It would have to have caused her pain. If she suffered from this medical condition of more than a back strain. But you don't have that in there. And just simply because she doesn't show any demonstrable signs of pain, do you really think that that results in a decision that's against the manifest way? Well, of course, I'm asking that you affirm the decision, but I think that even though there's not evidence of her speaking about pain, there is evidence of her image. You can obviously watch her image and see that she's not grimacing, see that she's not running into the house in pain or falling on the ground. I mean, these are all inferences that can be made by someone who's watching the tape, a layperson, about whether or not she's in pain. So I would ask again that I would point out, I guess, again, that Arbitrator O'Malley, although he watched it as a layperson, as I did, for whether or not the woman was in pain, didn't see through it the way the other three doctors who commented on it did, saying that this isn't spondylolisthesis-type pain, this is perhaps at most a back strain. And I so therefore would ask that the second Commission's decision, the remanded Commission's decision, be affirmed and sent back under Thomas. Thank you. Thank you, Counsel. Counsel, you may reply. I think, I know this Court knows, the standard review is very important. And unfortunately, to look at this video and start to pick it apart right now, all of us commenting on pain expressions and what Dr. Spencer said, the Commission, the original Commission, had a full opportunity to do that and did not buy into this video argument. Had there been no video taken by this respondent employer, she might probably have stayed with Dr. Mathur. He would have had no reason, he had no reason to suspect anything that she was doing was, you know, a malingerer. She's lying to me. There's nothing in there that challenges Barbara Leo's credibility in this case. Challenges is made with this video. And I think, you know, Barbara did not have to comment on video that we thought and the Commission, again, thinks was very de minimis. Pain expressions, did she have them or did she have them not, briefly moving her body around is viewed by the original Commission as de minimis. When the circuit court has a different opinion like anybody could, that's against, she's not, she is bound to take the Commission's view. And it's not just counsel talking about, well, the doctors versus the video. The Commission looked at the video, but they also, the Commission and the arbitrator, analyzed each of the doctors' opinions about the video and didn't buy into any of them, didn't say one was better. When Dr. Mathur basically discharges Barbara Leo and she has to go to Dr. Maltese, he's not going to look at the video, he's just going to treat her. That's a ridiculous argument to make that he should have seen this video. He sees somebody who he has to treat, does multiple surgeries on, points out in contradiction to Judge Wheaton that, no, this was a very good patient of his. He never, ever saw this patient malingering or trying to make a back strain into a seven-surgery odyssey, which is what she ended up having at this time. Again, I think the original Commission. My interesting question here, was there really any difference between the arbitrator's interpretation of what was on that video and what Dr. Spencer said? They both interpreted it the same way. In a way they do, because Dr. Spencer does say, my understanding of what Dr. Spencer did, had she been on a pain medication or something like that, and that was never really brought out, she'd have a flat-ass fat junk. You wouldn't know whether or not she was on pain medication, and that was never brought out in any kind of testimony in the record. We're not going to know that fact. So I don't think Dr. Spencer, and he then goes on to acknowledge, if she had all these things with no prior back treatment, surgery is a likelihood. I don't think he was the doctor that the respondent perhaps wanted, and that was the reason I think we got Dr. Trotter, because that, in the order of doctors, it's Dr. Mather, he no longer sees her, then we have Dr. Spencer, and then the respondent employer says, we need one more, and they get Dr. Trotter. So I don't think Dr. Spencer was the doctor. It's more in line with the arbitrator's view of this, of this video. And there's video all the time. This is not video where she's running a marathon, where she's doing things. And many people can look at that video. And, again, I suggest that the commission did take a good, long look at it and did rule in favor of Ms. Leo, and we would like that to be our decision in this case. So thank you so much. Thank you, counsel, both for your arguments. This matter will be taken under advisement. This position shall issue. Court will stand in recess until 9 a.m. tomorrow morning.